K-Con, Inc. v. Secretary of the Army Okay, Mr. Simon, did I pronounce your name correctly? You did. Okay. You reserved five minutes for rebuttal and so you may begin. Yes, Your Honor. Thank you. May it please the Court. My name is Robert Simon. I'm counsel for K-Con, Inc. K-Con had two contracts with the Army to provide pre-engineered metal buildings for the Army at Camp Edwards in Massachusetts. Were both of them metal buildings? I had the impression that the electrical hut was concrete. It was a concrete box. That's correct. So it was a metal building. You had one metal building and one concrete building. They generally refer to them as PEMBs, pre-engineered manufactured buildings. Right, manufacturers, but not metal. I said metal. I apologize, Your Honor. One was metal, though, and one was a concrete box. Each solicitation identified as solicitation for commercial item contract. It used Standard Form 1449, which is the form that you use for commercial item contracts. Neither solicitation included FAR Clause 52-228-15, which is a contract clause that requires payment performance bonds for construction projects. That's very germane here to this appeal in that after these contracts were awarded to K-Con, which is a small business, the government, the Army, informed K-Con that they needed to provide these payment performance bonds. At that time, they did not have the financial capability to provide the bonds. That's a problem throughout for small businesses in bidding construction work is getting the bond. And you thought these were contracts for commercial services, correct? That's correct, Your Honor. And wouldn't you say that this case turns on whether these contracts are for commercial services or for construction? Yes, Your Honor. In fact, if you turn to page— Didn't the conduct of the parties and almost everything else other than the form that was used, didn't it show that it's for construction of buildings? I mean, you started out that way. You started out by saying that this case involves a contract for construction of buildings, tools. It involved construction activities, but if you turn to the appendix and actually read the contract, you will—appendix 36, it's to furnish and install an 800-square-foot pre-engineered metal building with regards to the one that was a metal building. Furnish and install. Those are terms to supply something, not to construct. How do you install a building? You've got to build it or you've got to anchor it down. You've got to construct. In terms of the metal building, it's pre-engineered, so you're erecting it at a site. Think of it like a shed, a big shed. But you're putting it on a concrete slab, I take it. Correct. Right, and you have to build the slab. Correct. I mean, this building is not something that one is going to pick up and take away after it's been used for six weeks. This is a permanent structure, right? Correct. And there's other language in the contract that talks about construction, right? Like, for example, page 831, it talks about construction of a new pre-fabricated metal building. But it is acknowledging that there's construction. There's no dispute that there wasn't construction required for both projects. But you could have 100 billboards that have to be constructed on a base that you have to go out and build a foundation or a concrete slab to put the billboard on and build the billboard. Does that make it a construction contract that's subject to the requirements of the Miller Act? Let's assume that this is ambiguous, that you had an ambiguous situation here. You think that you're going to provide commercial services, and then later you see, no, this is for construction of a building, or everything points towards construction. Isn't it your obligation at that time to raise your hand and inquire as to the exact nature of the contract? I don't believe it's ambiguous at all. If you look at the commercial item contract itself, there are no construction clauses in it. If this was a construction services agreement, you would see dozens and dozens and dozens of federal acquisition regulation contract clauses. There are none. It identifies it as a commercial item contract because of the policy of the federal government that they want to do business with commercial vendors so that they don't have all the bureaucratic red tape and bonding and et cetera requirements. That's the whole reason why you defer and default to a commercial item contract is to avoid that. You can't put it on the burden of the contractor to decide what the government desired when they issued the solicitation. The classification of the contract is the government's burden, not the bidder's. If the bidder questioned every single time a commercial item contract came out that had some ancillary construction requirements to it, it would put a tremendous burden on the agencies. How much of your argument depends on the fact that this is a prefabricated building, as opposed to a building that was built by, say, a cinder block structure that was assembled cinder block by cinder block at the site? Because the government has argued that it's, and the board below argued it's a construction contract, I would say primarily because pre-engineered metal buildings, BMB, it is a commodity. It's a commercial item that you deliver to the site and furnish. So if this were a cinder block construction on the site, you would lose this case? I would say that based upon Judge Renta's position that we should have asked. Somebody should have said, hey, we're building a building here. Why is this being solicited under a commercial item contract in that case? But here, we're furnishing and installing a pre-engineered metal building, and it's done routinely in the federal government. What about the electrical hut or building? That's even more so than that. That's just a box that's delivered to the site, and then the government installed the telecommunications. That's almost like a shed. Here, in this particular— It's 400 square feet. It's a pretty big shed. It's a pretty big shed. But here, what's also telling is that when the government informed KCON of the requirement, they waited, they delayed until they were able to provide the bonds and issued a modification to the contract to incorporate the bonds and pay them for it two years later. Even the government wasn't sure when they issued this solicitation whether they were being correct when they let it. One of the things, if you read through the briefs and the board's decision below, the government says, oh, the Army violated their policy by doing this. And then the board says that at the time of award, this payment and performance bond was incorporated into the contract by the Christian doctrine. If that's the case, think about this. You have a small business, KCON, bids a commercial item contract without a bonding requirement. They win, and then the government turns around and says, you owe us payment and performance bonds. They can't provide them because they're financially unable. And the government says, you know what? You're a material breach of contract for failure to provide these bonds. We're going to terminate you for default, subjecting you to reprocurement costs. That is not fair. KCON is an established contractor, right? Are they? Yes. And have they handled construction contracts for the government before? Yes. And were bonds required at that time for those construction contracts? Yes. And you're going to love this one. The reason they could not provide the bonds was because that same agency had terminated one of their contracts for convenience. And they were trying to negotiate a settlement but unable. And it was that contract that was usurping the bond capacity. Okay. So to me, the be-all, end-all here is when you look at that contract, it's a commercial item contract. It expressly says that. It's the government's responsibility to classify its contracts. It looks like a duck. It quacks like a duck. It's a duck. It's a duck. And the government's trying to use the Christian doctrine to make that duck a goose. And I can't stress the importance that you can't have contractors doing the government's job. FAR Part 28 is what applies to the government in classifying their contracts. They're the ones that classified it as a commercial item contract. And they can't shift the expense and the cost associated with that decision to the contractor. Okay. Of course, the government has paid for the bond. They've paid the premium for the bond. The only thing that is at issue, I take it, is the delay expense. It took two years to issue notice to proceed. And in those two years, material and labor costs escalated, and that's what the claim was based on. And how much is the claim for? $116,000. Okay. Thank you very much. Okay. Attorney Toplin. Yes, Your Honor. May it please the court, the government respectfully requests that you affirm the decision of the PCA affirming the Army's decision to reject KCON's request for equitable adjustment. The bonding requirements are properly incorporated into these contracts via the Christian doctrine. KCON was already compensated for the cost of getting the bonds. All the additional costs were due to KCON's inability to timely furnish the bonds. They were not the fault of the government. FAR specifically precludes an REA when the delay is the fault of the contractor. And for that reason, KCON has already been made whole. As I said, the bonding requirement is incorporated into this contract. I'm interested in your opponent's argument that what you were doing, you were purchasing a building, not construction services. We were purchasing the construction of a laundry facility and a telecommunications hut, Your Honor. If you look directly in the project statement of work, it says the task order provides... Where are you reading from? Pardon? What page are you reading from? Oh, I apologize. 832, Your Honor. Provide for the design and construction of a 20... 832? 832, environmentally friendly, controlled laundry facility in compliance with all local codes and GSA schedules. There are lots of instances in this paper that you're referring to here where it refers to construction. But it also says that this is a solicitation for commercial items. I mean, on page 828, that's exactly what it says it is. And there's also been an argument by KCON that seems rather persuasive that, moreover, you'd see all sorts of different clauses in this contract if it, in fact, were a construction contract. So how do you respond to that? Well, I certainly acknowledge the fact that the incorrect form was used. But if you do look throughout the contract, you see that it was intended to be a construction contract. There are construction clauses. I mean, certainly this was already bid off of the GSA schedule, so it was slightly different. But it's clear throughout the contract that the only indication of commercial items is the fact that we used a commercial items form, erroneously used a commercial items form. But if you look at what actually has to be designed, the key of contract interpretation is to interpret the contract as a whole. Look at all the provisions. And if you look at the work to be done, the work to be done is construction of the facility. The work to be done throughout this makes it clear that the building is a prefabricated building. It's just one minor part. It's sort of the largest procurement part, but it involved site work and foundation and involved actually erecting a structure and installing the inside, concrete work, and actually creating a laundry facility. I may have distracted you. You were going to point out exactly, I think, on page 832, the language that you thought supported what you're saying right now. Oh, I apologize. No, no. Please don't apologize. The first sentence under project scope, Your Honor, this task order, you see on top of 832, number one project scope, Your Honor. It says the task order provided the design and construction of a 20-foot by 40-foot environmentally friendly and environmentally controlled laundry facility. So we're actually not procuring a prefabricated structure. We're procuring the construction of a laundry facility. I interrupted. So go ahead. I want to hear the rest of what you're saying. I believe that was what. OK. Look at 31 of the appendix. It says laundry facilities, construction of a new prefab. Then it says FOB destination. What does that mean, FOB destination? I know what it means. But in terms of a construction, it seems to me FOB destination is a commercial term used in the purchase of items. And it describes, it sets limits on the delivery of the items. As I understand it, it does as well, Your Honor. But the key is you have to look at the contract as a whole. And the contract as a whole makes it very clear that it is one for construction. It does include a prefabricated building. Yes, it's not constructed brick by brick, as Judge Bryson pointed out. It is a metal or concrete structure virtually holding a box. But it's a rather large shed that they still have to do the excavation. They still have to do the site work. They still have to do the prep work. They still have to put up these structures and create them for a specific purpose. Likewise, the statement of work doesn't reference construction causes. It specifically includes a Davis-Bacon. Likewise, Kaycon's proposal also references construction clauses and includes the Davis-Bacon wage rates, which are proof for construction contracts. It's very clear from the contracts itself as well from the parties' course of dealing that it was always viewed as a construction contract, albeit the fact that it was erroneously issued on a commercial items document. Mr. Simon, I think this question was asked before, but I want to make sure we have your answer to it. Mr. Simon said, well, look, if this were a construction contract, there'd be lots of other provisions in it that are typically in construction contracts that are not in commercial item contracts. Now, you've mentioned the Davis-Bacon Act reference. Are there other things that you would see in a pure, indubitable construction contract required by the FAR or otherwise that are not in this contract? I mean, certainly you would, potentially depending on the scope of a construction contract, you would see lengthier clauses. But the key is, what is being... Well, give me an example of the kinds of clauses you would see in a construction contract that are not here. I mean, maybe this is a question really for Mr. Simon more than it is for you, because he raised it. But I'm trying to get a feeling for whether there's more here than just the wrong form. But rather, there is any kind of holistic pointing towards commercial item as opposed to construction. I think that, Your Honor, what it is is that it was used with the wrong form because of the way that Kay Conn's contract was structured. What you see, what you potentially see is there are certain clauses that are referenced in this out that presumably would have been included in the contract, like liquidated damages clauses or the prompt payment provisions. So certainly, they would have been included. But as I said, certainly there presumably are more. But the statement of work does reference some of the payment clauses, incorporates the FAR clauses for payments under fixed-price construction contracts and prompt payments for construction contracts. So likewise, there are some contracts. Presumably, they would have been in the contract themselves had it been a more lengthy construction contract and probably a more complicated construction project that involved more work. But it was very clear that the parties understood that the typical construction clauses govern these contracts. In fact, it's acknowledged in Kay Conn's proposal that— Are there other—is there other language that you're relying on beyond the language of page 832 under project scope? I presume there's other language. Other language showing that— In that contract, showing that it's a construction contract and not just the acquisition of a good. Yes, Your Honor. Under the design services, the engineering design services required to develop and submit basic construction plans— What were you reading? 832 as well. Below there, it indicates that there are construction plans that have to be submitted. If Your Honor is to turn to 833, Division 1, 1.1, talks about construction permits. As well, 1.7 on 833 as well talks about payment and incorporates the FAR clauses for payments under fixed-price construction contracts and the FAR clause for a prompt payment for construction contracts. Likewise, on page 834, 1.12 incorporates the Davis-Bacon wage rates. If then, Your Honor— Davis-Bacon is applicable only to construction, is that right? Yes, Your Honor. That was my impression. Yes. I apologize. Which one was that? You're on page 834. 834, 1.12 incorporates the Davis-Bacon wage rates into the contract. Your Honor, as I said, the contract has to be integrated as a whole, and Your Honor is to look through what is being done. Division 2, starting on 834, running through Division 7, exclusive of Division 7, which is on 836, talk about all the construction work. Talk about construction of the floor slab, utility work, talks about all the construction work. It's not until Division 7 on 836 that we actually get to the prefabricated building. So the prefabricated building is just one aspect of the larger picture here, which is the construction of an actual laundry facility. So if you look at the contract as a whole, it's very clear that it is a contract for construction. Likewise, if you were to go on throughout the contract, 837 includes more construction work, mechanical work, electrical work, as well as 837 also incorporates liquidated damages causes, liquidated damages clause if they extend beyond the date to complete the necessary construction work, which is typical for construction contracts. Then we go on into KACON's proposal, Your Honor, incorporating further indication that they understood it to be construction contracts, specifically on 843, Your Honor, talking about how it was they bid this contract, including typical construction clauses that are in their standard GSA contract. And this KACON proposal goes on to kind of restate the work that had to be performed, as well as the Davis-Bacon wage rates. So it's very clear that from this contract's inception, from the time it was issued, from the time the KACON made its proposal, everybody understood it to be construction. A duck is a duck is a duck, as Mr. Simon said, but that duck is construction here. Everybody understood it to be construction. It was not until KACON actually went to the board did they ever, ever make any sort of indication that this was not a construction contract. As I think Your Honor Rayner indicated, their course of dealing clearly indicates this was a construction contract. Not only beyond the proposals, the government first came back a few weeks after the award and said this is a construction contract and we need bonds. KACON never said the bond wasn't required. Instead, they repeatedly quoted the bonding requirements for a construction contract and offered a tripartite agreement, implicitly acknowledging that it was a construction contract and trying to break that contract down into three separate contracts so they could avoid, so they could put it on the table. Well, they're a small contractor, they're a small business, and I kind of understood why they're now talking with you. It may quack like a duck and look like a duck, but you guys called it a goose. You used the wrong form. You started the whole process and put that into place. So it's not, you know, it doesn't seem just to criticize the contractor that's now trying to find a solution to this. Oh, not criticizing them for offering a solution, Your Honor. Not criticizing them at all. Just pointing out the fact that they acknowledged at that point in time that it was a construction contract and at that point in time had they never viewed this as a construction contract which Mr. Simon today posited the fact that KCON always saw this as a commercial items contract. Well, if they saw this as a commercial items contract, why didn't they come back and say, you're wrong, you don't need bonds, this is a commercial items contract? They didn't. They acknowledged it was a construction contract and tried to push it under the simplified acquisition threshold. I'm not criticizing them for trying to find a different plan. The government didn't feel that plan was sufficient, wasn't obligated to take it. What I'm saying is, at that point in time and going forward, their entire course of dealing made it very clear that everybody saw that the duck was construction, albeit the fact that somebody called it a goose. It was everybody needed to understand what to be done was construction. Because the bonier requirement is mandated for all construction contracts by the Miller Act, it can be incorporated by operational law via the Christian doctrine. It's very clear that bonding requirements are a significant aspect of procurement policy. They've been around since 1894. It's very important that this court and the Court of Federal Claims have spoken about the need to use bonding to protect subcontractors and suppliers, payment bond and the permits bond to protect the government. It's very clear that bonding is deeply rooted in government construction policy, federal procurement policy. Well, there's no doubt that bonding is out there and it's insisted upon and so forth. But are there any cases at all that apply the Christian doctrine to the bonding provisions? Not that I'm aware of. I didn't see either side citing anything on that. No, not that I'm aware of, Your Honor. But in this case, the bonding requirements can be incorporated because these contracts were clearly for construction, as I've shown, the intent of the party clearly established that. And just to make one point clear, just to kind of go back to something that Mr. Simon said, is that KCON was made whole here. The government promptly told them before any notices or proceedings issued, certainly just a few weeks after, or before they incurred any costs, and said, we need bonds. KCON never came back and said, we can't offer bonds. Instead, they went around and tried to get around it and the government consistently said no. And in fact, when the government actually said to KCON, before any notices or proceedings issued, they never issued a notice to proceed until the bonds were given, before KCON expended any costs. They said, we will give you a T for C because the bonding requirements are not there. Termination for convenience. Termination for convenience, which would have required the government to pay any costs that KCON had incurred. KCON said no. KCON wanted to go forward. KCON went forward. We compensated them for the additional cost of bonds that was not in the contract, for everything that they incurred to get those bonds. And then what they're now trying to seek is they're now trying to come back and seek cost escalation. KCON has made hold for the government's error. Had they promptly furnished the bonds, there would have been no cost escalation here. Certainly had they promptly said that they couldn't furnish the bonds, the government could have terminated the contract at that time. Are the buildings constructed? Has there been full performance on the contract? Yes, Your Honor. Mr. Simon asked a rhetorical question that, would it be fair if the government terminated the contract for default in a situation in which, like this case, there had been no requirement of a bond, but the government came back later and said, you must have a bond. And then when they couldn't come up with the bonds, they default them. Well, certainly that issue is not before the court. I understand. And I'm just curious as to what the government, what your take on that is. Because he's saying that that's where this all leads, down the line. And he's saying that's a very unattractive proposition. And so what do you say to that? I mean, certainly, assuming that the bond-error requirements were written in via the Christian doctrine and were written in assuming at the point of contract inception, there could be a, presumably, the law does allow a termination for default here. But that's not the situation here. We actually offered termination convenience. So you're answering his rhetorical question by saying, yeah, we could. It could happen. It certainly is not what we did here. It certainly was never intended to treat KCON in any sort of inequitable way. The government, when they said bonds are required, they immediately offered to furnish the cost of bonding. KCON never came back and said, this is a commercial items contract. They never came back and said they can't get the bonds. And for two years, they never even came back and discussed the fact that they were going to try to make a claim for cost escalation. Okay, we got your argument. Thank you, Your Honors. Mr. Simon, we'll put you back at three minutes. Thank you. So I don't want to lose sight of the legal issue that's before this panel. The issue is whether the Christian doctrine applies to this contract. Counsel for the government got some of the background facts that we never really got into at the Board because it was just decided that the Christian doctrine applied and therefore our claim was invalid because it was based upon the payment and performance bond issue. Without these pre-engineered metal fabricated buildings, which is a commercial item, they are fabricated and made and purchased in quantities. You go and you buy these things and you deliver them to construction sites. If you don't have that commercial item, you don't have any construction activities here. The construction activities surrounding those commercial items are ancillary to the project. There was no reason for KCON to think that when the solicitation was identified as a commercial item contract that it was anything but that. Indeed, there are none of those FAR regulation clauses at FAR 52 in this contract, line item by line item by line item, that you would see in a normal construction contract. The last thing... I didn't want to interrupt too long, but more and more you see modular homes, for example, being built where the trucks pull up and they've got, on a series of trucks, they've got the living room, they've got the kitchen, they've got the bedrooms. Those are construction, right? You wouldn't consider... You put the house on a slab, you construct the house from all of the parts, you paint, you put in the plumbing, and if that's not construction, in your view? FEMA solicits those sorts of contracts. FEMA trailers are movable. They move around. I'm talking about... But they put them permanent. They can remove them later, but even the modular homes are movable. Now, I'm not granted a contract. All right. Okay. And they're acquired through commercial item contracts. But you're not a retailer or distributor of prefab buildings. No, we're not. That's true. You're a construction company. That's true. That's true. The only last thing I want to say is that when you use principles of contract interpretation and you look at this contract and it says it's a commercial item contract, the form that you use is a commercial item contract, I don't know how you harmonize and try to contend and say as a matter of law it's a construction contract. I get that there are construction activities in this contract. We're not disputing that. But the issue is whether it was identified, the nomenclature that was used by the government to indicate it's a construction contract. If they would have done that and omitted the payment and performance bond requirement, I would not be here today. Okay. We got that. We got your argument, sir. Thank you very much. Thank all the parties for the arguments. Of course, now we'll reset.